***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Dollar. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms in part and reverses in part the Opinion and Award of Deputy Commissioner Dollar.
 ***********
The undersigned finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. American Home Assurance was the carrier on the risk.
3. The employee-employer relationship existed between the parties at all relevant times herein.
4. Plaintiff sustained an admittedly compensable injury to her back on June 3, 2002, at which time her average weekly wage was $319.48. Defendants accepted plaintiff's claim as a medical-only claim.
5. Plaintiff last worked for defendant-employer on or about July 16, 2002.
6. The issues for determination are:
 a. Whether plaintiff is entitled to past and future medical treatment for the compensable injury she sustained on June 3, 2002?
 b. Whether plaintiff is entitled to temporary total or temporary partial disability benefits from June 3, 2002 and continuing until such time as she is provided with suitable employment? and
 c. Whether plaintiff is entitled to permanent partial disability benefits if she is determined to have reached maximum medical improvement?
7. The parties stipulated the following documentary evidence:
a. Western Wake Emergency Services, fourteen pages;
b. Concentra Medical Center, forty-six pages;
c. Wake Radiology, one page;
d. Raleigh Orthopaedic Clinic, eight pages;
e. ProActive Therapy, eleven pages;
f. I.C. Forms 18, 33R and 33;
 g. Plaintiff's Answers to Interrogatories, eight pages;
h. Defendants' Answers to Interrogatories, four pages;
i. Defendants' 607 Response, forty pages; and
j. ESC Documents, ten pages.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was forty-years old and resided in Knightdale, North Carolina. She has a tenth grade education and prior experience as a cashier and a presser. Plaintiff received Social Security disability benefits since 1993 due to a seizure disorder. She also has pre-existing asthma. Plaintiff is able to read and write, although she did indicate she did not spell well. Plaintiff began working for the employer in the Fall of 2001.
2. At the time of the compensable injury, plaintiff was employed as a shoe department associate. Her duties included stocking and cleaning shoes, removing paper from shoeboxes, helping customers and retrieving shoes from the stockroom or shelves for customers. Stocking shoes required plaintiff to get individual shoeboxes from larger shipping boxes on pallets and place the individual boxes in bins in the stockroom. Plaintiff was not required to lift the large boxes on the pallets. These boxes were shrink-wrapped and lifted by a forklift. Rob Hensley, the shoe department manager, was plaintiff's immediate supervisor.
3. On March 24, 2002, plaintiff received a disciplinary conference, called a coaching for improvement, due to her failure to clear five pallets, as she had been assigned to do.
4. Under defendant's injury policy, employees are trained that as soon as they realize they are injured, they should report the injury to a member of management. Members of management include the immediate supervisor, department manager, store manager, or personnel manager. Personnel Manager Barbara Prince coordinates workers' compensation claims for the Knightdale store. Once a report of an on-the-job injury is made, she talks with the employee to see if they are okay. If so, then she has them prepare an Associate's statement. If they require medical care, she prepares a form to authorize the care and has a member of management take the employee to the doctor.
5. On June 3, 2002, plaintiff was assigned to work freight with a coworker from 11:00 a.m. to 4:00 p.m. She actually worked 5.35 hours. This entailed using a box cutter to open the large shrink-wrapped boxes, place the individual boxes on shoe carts, roll the carts out to the shoe department and place the shoes in their proper location. The receiving department receives large stacks of boxes of shoes and breaks these down, placing them on pallets which are organized in the stockroom. At the hearing before the Deputy Commissioner, plaintiff testified she was lifting a box, which contained six pairs of men's shoes, when she felt pain in her low back, even though she was not assigned to lift the large boxes and had no reason to lift one.
6. At the hearing before the Deputy Commissioner, plaintiff testified that as soon as she injured herself, she went to report her injury to Ms. Prince. She contended Ms. Prince tried to dissuade her from reporting an injury by telling her she had won a 27-inch color television in the store drawing and she could not receive the television if she reported an injury. Plaintiff's testimony was specifically rejected as not being credible. The competent evidence in the record established the employer has never given a 27-inch television as a prize for the safety drawing. Second, plaintiff did not go to report the injury until June 4, 2002. Third, Ms. Prince testified she was at lunch and upon her return, plaintiff had already reported the injury to others at the store, and Ms. Prince only prepared the treatment authorization form. Plaintiff further offered testimony that Marlene Hunter and others at Wal-Mart told her they would not pay for her medical care, and she indicated trouble with getting prescriptions paid. This testimony is also rejected as not being credible. The competent, credible evidence clearly establishes that plaintiff was notified by Ms. Prince and Ms. Valentino that treatment was authorized and, in fact, the employer paid for medical care until she was terminated.
7. On June 4, 2002, plaintiff worked the 11:00 a.m. to 4:00 p.m. shift. She reported her injury to Store Manager Marlene Hunter or Gretchen Crews in the afternoon and requested to see a doctor. When Ms. Prince returned from lunch, she found them in personnel. Ms. Prince completed a workers' compensation request for medical care form at 3:00 p.m. and authorized plaintiff to receive treatment at Concentra Medical Center on Green Road in Raleigh. Ms. Crews drove plaintiff for the initial medical appointment. Plaintiff's claim was accepted as a medical-only claim.
8. On June 4, 2002, Dr. Michael Landolf of Concentra Medical Center examined plaintiff's low back pain. Plaintiff stated she developed pain over the past week because she lifts too much at work. She indicated she had mild aching before, but it became much worse on June 3, 2002 after she lifted a heavy box. X-rays were reported as negative and Dr. Landolf diagnosed her with back pain, recommended ibuprofen, ice packs and gave work restrictions of no lifting over twenty pounds, no pushing or pulling over forty pounds and no climbing ladders. On June 6, 2002, plaintiff returned for treatment at which time she reported concerns of the job being too heavy for her. Dr. Landolf continued the restrictions and prescribed Skelaxin.
9. The employer prepares the work schedule four weeks in advance. Plaintiff was previously scheduled to be on vacation leave from June 5 through June 10, 2002. On June 5, 2003, claims analyst Michelle Valentino wrote plaintiff to advise her of the proper forms and procedure for her workers' compensation claim. In this letter, she advised plaintiff that in North Carolina the employer had the right to select the doctor to provide medical care.
10. On June 10, 2002, Kevin Pilecki, PA-C, saw plaintiff for a follow-up appointment for her backache. She reported her symptoms were worsening, with pain radiating into the posterior aspect of both thighs. Therapy was ordered and plaintiff was given a prescription for pain medication. Plaintiff advised she was told the medication would not be covered, so she did not fill the prescription.
11. On June 11, 2002, P.A. Pilecki rechecked plaintiff for her low back pain. She reported she returned to work but was unable to continue the zoning duties, which she described as moving shoes below shoulder level. She indicated this required repetitive bending forward or at the knees. She indicated she had not filled the Skelaxin prescription and was encouraged to do so. Plaintiff complained of pain radiating in her right and left buttocks and bilaterally in the posterior thighs.
12. Plaintiff went to Barbara Prince on June 12, 2002 at 1:23 p.m. to request to go home due to pain. Ms. Prince offered a number of times to allow plaintiff to sit in the grill area to rest and then to try her duties again, but plaintiff refused and instead insisted she needed to go home. Ms. Prince noted this discussion, as she wanted to document she had attempted to accommodate plaintiff's restrictions.
13. On June 12, 2002, plaintiff sought treatment at Western Wake Emergency Services. Triage noted, "Patient here for back pain started June 1st while reportedly at work Patient here because pain continues and the employer won't take her off the schedule." Plaintiff was authorized to return to work in two days with restrictions of lifting no greater than fifteen pounds, avoid prolonged standing and walking, avoid bending or twisting at the waist, overhead work and climbing for one week. Plaintiff was discharged and given a prescription of Naprosyn for pain associated with her back strain.
14. On June 13, 2002, Dr. Landolf examined plaintiff during a scheduled appointment for back strain and authorized her to return to work with restrictions of no repetitive lifting over ten pounds, no bending greater than two times per hour, no pushing or pulling over forty pounds of force, and no reaching above her shoulders. Plaintiff reported a history of low back pain, which was worse on lying down, sitting, walking, or bending. She reported the discomfort was constant.
15. On June 13, 2002, plaintiff also reported for physical therapy supervised by Julia Brugnolotti, PT. During their initial conference, plaintiff reported a history of lifting a thirty to forty pound box from floor level and twisting to the right to set down at waist level. She reported a constant pain in the lumbosacral area which was sharp at times, and which were exacerbated by bending from the waist, prolonged sitting, standing or walking, and which were alleviated by ice, lying on her left side and sleeping. Plaintiff later reported being anxious about returning to work due to an argument with management about the injury and being on restricted duty. The therapist noted plaintiff's complaints were consistent with a lumbar muscle strain.
16. On June 15, 2002, plaintiff was assigned to work as a greeter in the electronics department from 7:00 a.m. to 4:00 p.m. She complained of severe pain and was excused to go to the employee lounge area to rest. After taking a break, plaintiff returned to the electronics department, around 11:00 a.m., taking a cup of water with her. Ms Prince saw this and informed plaintiff she had to leave the water in the lounge. Plaintiff became confrontational and accused Ms. Prince of forging her name on medical paperwork and she became loud and started cursing. Ms. Prince asked a number of other employees near the area to leave. Plaintiff yelled about being fired because she was injured. Ms. Prince called for another member of management, and they were able to get plaintiff to calm down. Later, plaintiff apologized to Ms. Prince for the outburst and defendants did not write plaintiff up, although the incident was documented.
17. On June 15, 2002, associates Tracy Price and Carlos Lynch observed plaintiff cursing, yelling, screaming and being disrespectful to management. The manager walked away from the dispute to give plaintiff the opportunity to calm down. In the employee manual, any cursing is considered gross misconduct. All employees are informed of this during orientation. Violent behavior is also against defendant's policy.
18. On June 16, 2002, plaintiff sought treatment at Concentra and was again seen by PA Pilecki. Plaintiff's diagnosis remained the same, back strain, but her restrictions were changed to no lifting over 15 pounds and no pushing /pulling over 30 pounds.
19. On June 17, 2002, plaintiff returned to Concentra where Kevin Pilecki, PA-C, examined her for complaints of increased pain due to prolonged standing as a store greeter. An orthopedic evaluation was recommended.
20. On June 18, 2002 at 9:44 a.m., plaintiff contacted Western Wake Emergency Services to advise that in her June 12, 2002 notes, she denied having back pain prior to the incident at work. She further corrected that she had back pain a week before coming in the emergency room, but did not get back pain on June 1st, but started feeling pain the day after her injury at work on June the 4th. This contact was noted in the file by hospital staff.
21. On June 19, 2002, plaintiff was authorized to return to work with restrictions of no repetitive lifting over fifteen pounds and no pushing or pulling over thirty pounds of force. By June 21, 2002, the restrictions were raised to no pushing or pulling over forty pounds of force. However, plaintiff reported to P.A. Pilecki that she wanted to remain in the greeter position. On examination, Mr. Pilecki requested an orthopedic evaluation for this case.
22. In therapy sessions on June 19 and 24, 2002, plaintiff continued to offer subjective complaints which were inconsistent with the physical findings. She also offered questionable effort on activities in therapy and positive results in distraction tests. On June 19th, she reported feeing overall improved. On June 24, 2002, plaintiff was discharged from physical therapy due to minimal complaints of pain.
23. On June 27, 2002, plaintiff signed the written job description, indicating she was capable of performing these duties. After the release to full duty, defendants assigned plaintiff to work as a greeter or to zone the shoe department.
24. On July 8, 2002, orthopedist Dr. Andrew Bush examined plaintiff and released her to return to regular duty. During the course of the evaluation, plaintiff could only reach down with her fingertips to midlevel of her thigh, however, with sitting straight leg raise, her waist flexed to 90 degrees and her knees completely extended out. Therefore, Dr. Bush noted this would give her the ability to touch her toes, and this conduct was noted as an inconsistency. Plaintiff further reported that her pain was initially localized to the back, but later was shooting down her right leg to her toes and was circumferentially around the leg. She also reported no improvement with therapy.
25. Following her return to work, plaintiff was assigned to work as a greeter in the electronics department, where she worked until July 8, 2002. Plaintiff's duties included greeting customers, providing shopping carts, lifting items up to ten pounds, deactivating items and picking up small items.
26. On July 12, 2002, Alison Gruebel, Concentra's Center Administrator, noted plaintiff had shown up at 5:07 p.m. to be seen. Notwithstanding plaintiff's pain complaints, the medical personnel refused to see plaintiff because the Center closed at 5:00 p.m., and further because the employer's management had advised earlier that plaintiff was not authorized to return after having been released from treatment on July 8, 2002.
27. On July 15, 2002, plaintiff sought additional medical treatment at Western Wake Emergency Services as a result of being denied further medical treatment at Concentra. Dr. Gay Benevides authorized plaintiff to return to work on July 16, 2002 with no heavy lifting until cleared by an orthopedist.
28. Plaintiff testified that on July 16, 2002, she took the note from Dr. Benevides to Ms. Prince, who advised her the note would not be honored, as Dr. Benevides was unauthorized. On July 16, 2002, the competent, credible evidence supports a finding that plaintiff was scheduled to work 4:00 p.m. to 10:00 p.m. At approximately 5:00 p.m., plaintiff went to the personnel department. Ms Prince was not at the Knightdale store at that time, as she had responsibilities at another store. When Ms. Prince returned to the store, she heard loud voices coming from personnel. She saw Ms. Hunter standing there and heard plaintiff's voice yelling about knowing they want to fire her. Ms. Hunter told plaintiff she was done with this. Assistant Store Manager Greg Meadows then told plaintiff she could not talk to her supervisors in this manner, and plaintiff yelled again about being fired. Ms. Hunter told plaintiff she no longer worked for her and to leave the store.
29. On July 16, 2002, the employer terminated plaintiff after she became angry, and threatened members of management. Ms. Prince did an exit interview with plaintiff and noted plaintiff had been released to full duty when she was terminated for gross misconduct pursuant to the employee manual.
30. Plaintiff continued to experience back pain and sought treatment from an orthopaedist per Dr. Benevides' recommendation. On August 14, 2002, plaintiff presented to Dr. Stephen P. Montgomery, an orthopaedist. Plaintiff reported a history of straining her back after lifting a box of shoes on June 3, 2002. Plaintiff indicated she had received treatment, therapy and medication with no improvement. Diagnostic studies were reported as normal and plaintiff was found to be neurologically intact. Therefore, Dr. Montgomery diagnosed plaintiff with a soft tissue strain. Plaintiff also reported to Dr. Montgomery that her workers' compensation claim had been denied. Thus, Dr. Montgomery did not order a F.C.E. to establish her functional capabilities.
31. Dr. Montgomery ordered additional therapy and encouraged plaintiff to return to work. Plaintiff attended ProActive Therapy from August 8 through September 6, 2002 and completed her course of physical therapy as prescribed by Dr. Montgomery.
32. By March 18, 2003, plaintiff was reporting right leg pain, trouble sleeping and decreased sensation in the left foot. Dr. Montgomery noted this was a discrepancy. She also exhibited a positive straight leg raising on the left. An MRI was ordered due to plaintiff's leg pain. However, the results of this study were normal.
33. On or about April 14, 2003, Dr. Montgomery found plaintiff reached maximum medical improvement and retained no permanent impairment and was not a surgical candidate as a result of the soft tissue strain she sustained on June 3, 2002.
34. Dr. Montgomery opined to a reasonable degree of medical certainty that plaintiff's back strain was caused by plaintiff's June 3, 2002 injury at work.
35. As of July 8, 2003, defendants offered and provided suitable work to plaintiff.
36. The credible evidence in the record establishes that defendants stopped authorizing plaintiff's medical treatment as of July 8, 2002 and released plaintiff from further medical treatment. However, plaintiff was still experiencing pain related to her June 3, 2002 work related injury and the defendants' should have continued plaintiff's medical treatment. Defendants refusal to continue to treat plaintiff plus her ongoing pain have established good cause for her to seek further medical treatment and request a change in medical treatment.
37. Plaintiff attempted to notify defendants of her need for additional medical treatment when she presented her note from Dr. Benevides to Ms. Prince regarding plaintiff's work restrictions. However, Ms. Prince refused to honor Dr. Benevides note.
38. Plaintiff's Form 33 served as her motion for additional medical treatment and it was filed on or about July 29, 2002, shortly after she presented to the emergency room on July 15, 2002. Thus, plaintiff timely requested the right to seek her own medical treatment. Since plaintiff made a timely request for approval of medical treatment and defendants refused further treatment for plaintiff nothwithstanding her ongoing pain and notice of plaintiff's need for additional medical treatment, plaintiff was reasonable in seeking further medical treatment on her own initiative.
39. The competent evidence in the record establishes that notwithstanding plaintiff's inappropriate behavior at work, she continued to experience pain thru April 14, 2003 as a result of the soft tissue strain she sustained at work on June 3, 2002. The competent evidence in the record also establishes that the treatment Plaintiff received at Western Wake Hospital, ProActive Therapy, Raleigh Orthopaedic Clinic, and the MRI study ordered by Dr. Montgomery were necessary in order to treat plaintiff and provide relief to plaintiff for her compensable back injury. Therefore, plaintiff is entitled to have defendants pay for this medical treatment.
 ***********
Based upon the foregoing stipulations and findings of fact, the undersigned makes the following
 CONCLUSIONS OF LAW
1. In order to qualify for compensation under the Workers' Compensation Act, a claimant must prove both the existence and extent of disability. Hilliard v. Apex Cabinet Co., 305 N.C. 593,290 S.E.2d 682(1982). Once an employee has reached maximum medical improvement, she must establish permanent incapacity to prove the extent of disability, Anderson v. Gullistan Carpet,Inc., 144 N.C. App. 661, 550 S.E.2d 237 (2001). In this case, plaintiff retains no permanent impairment. Therefore, she has failed to carry the burden of proof to establish she is entitled to additional benefits.
2. Disability may be proven in one of four ways: (1) the production of medical evidence that the employee is physically or mentally, as a consequence of the work-related injury, incapable of work in any employment; (2) the production of evidence that the employee is capable of some work, but has after a reasonable effort been unsuccessful in his efforts to obtain employment; (3) the production of evidence that the employee is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment; or (4) the production of evidence that the employee has obtained other employment at a wage less than that earned prior to the injury. Russell v. Lowes Prod. Distrib.108 N.C. App. 762, 425 S.E.2d 454 (1993). Plaintiff has failed to satisfy her burden of proving she had any disability as a result of the injury.
3. Plaintiff is not entitled to permanent partial disability compensation. She was found to retain no permanent impairment under N.C. Gen. Stat. § 97-31.
4. Plaintiff is entitled to have defendants pay for medical expenses incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability. N.C. Gen. Stat. § 97-2(19).
5. Plaintiff is entitled to have defendants pay for the treatment she received from Western Wake Hospital, ProActive Therapy, Raleigh Orthopaedic Clinic and the MRI ordered by Dr. Montgomery. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following
 AWARD
1. Plaintiff's claim for indemnity benefits is, and under the law must be, DENIED.
2. Defendants shall pay medical expenses incurred in accordance with the provisions of the Act, including treatment from Western Wake Hospital, ProActive Therapy, Raleigh Orthopaedic Clinic and the MRI ordered by Dr. Montgomery.
3. Defendants shall pay the costs.
This the ___ day of August, 2004.
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER